FILED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

9:25 am, 7/19/24

**Margaret Botkins**
**Clerk of Court**

GREEN ROOM LLC, et al.,

      Plaintiffs,

  vs.

STATE OF WYOMING, et al.,

      Defendants.

Case No.  24-CV-128-KHR

---

**ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

Before the Court is Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction. [ECF No. 7]. The original motion was filed in conjunction with the Complaint on June 28, 2024, and was subsequently amended to the present filing on July 1, 2024. Plaintiffs are a collection of "Wyoming wholesalers, retailers[,] or manufacturers of hemp products who wish to distribute and sell hemp products in and outside the state of Wyoming." [ECF No. 1, at 5]. Defendants are various Wyoming government officials.[1] Plaintiffs challenge the constitutionality of Senate Enrolled Act No. 24 ("SEA 24"), an amendment to some of Wyoming's hemp production and controlled substances statutes. Plaintiffs seek a temporary restraining order ("TRO") or preliminary injunction to block

---

[1] The prosecuting attorneys originally included in the case were dismissed by stipulation of the parties. [ECF No. 29].

the enforcement of the law. The Court, being fully advised, finds the Motion should be denied.

## BACKGROUND

The Agricultural Improvement Act of 2018 (the "2018 Farm Bill") was signed into law on December 20, 2018. [ECF No. 1, at 3]. A significant change in the 2018 Farm Bill is that it removed hemp from the Controlled Substances Act. *Id.*; *see also* 7 U.S.C. § 1639o(1) & 21 U.S.C. § 802(16)(B)(i). Under § 1639o(1), the term "hemp" means the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis. 7 U.S.C.A. § 1639o. In general, the 2018 Farm Bill "authorizes states to legalize hemp and regulate its production within their borders but generally precludes states from interfering with the interstate transportation of hemp." *Serna v. Denver Police Dep't*, 58 F.4th 1167, 1168 (10th Cir. 2023).

In 2019, Wyoming enacted legislation permitting the sale of hemp and its production, subject to certain restrictions and regulations. Wyo. Stat. Ann. §§ 11-51-101 through 107. Wyoming's legislation defined hemp similarly to the 2018 Farm Bill's definition. "'Hemp' or 'hemp product' means all parts, seeds and varieties of the plant cannabis sativa l., whether growing or not, or a product, derivative, extract, cannabinoid, isomer, acid, salt or salt of isomer made from that contains no more than three-tenths of one percent (0.3%) on a dry weight basis when using post-decarboxylation or another similarly reliable testing method." Wyo. Stat. Ann. § 11-51-101. After its enactment,

Plaintiffs developed business for the production and sale of hemp, operating in accordance with Wyoming's statutory scheme for the past five years. However, the Wyoming Legislature recently passed amendments to the 2019 statutes during the 2024 legislative session. Senate Enrolled Act No. 24, 2024 Wyo. Laws Ch. 56 (S.F. 32), sec. 1, Wyo. Stat. Ann. § 11-51-101 through 104, Wyo. Stat. Ann. § 35-7-1014, 1063. Those changes have led to the current dispute.

As amended, § 11-51-101(a)(iii) now defines hemp as "all parts, seeds and varieties of the plant cannabis sativa l., whether growing or not, or a product, derivative, extract, cannabinoid, isomer, acid, salt or salt of isomer made from that plant **with no synthetic substance and** with a THC concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis when using post-decarboxylation or another similarly reliable testing method." (bold indicates new statutory language). A "'synthetic substance' means synthetic THC, synthetic cannabinoid or any other drug or psychoactive substance." § 11-51-101(a)(viii). It further expanded the definition of THC to include "[p]sychoactive analogs of tetrahydrocannabinol as defined by W.S. 14–3–301(a)(xi)" and "[a]ny psychoactive structural, optical or geometric isomers of tetrahydrocannabinol." § 11-51-101(a)(vii).

The Wyoming Legislature also amended the sections dealing with prohibited activities and enforcement. Subsection (f) was added to § 11-51-103 to prohibit the production, processing, and sale of hemp with more than 0.3% THC on a dry weight basis. Any addition of synthetic substances into hemp was also prohibited. Wyoming Statute § 11-51-104 was amended to include "synthetic substances" for violations. The preexisting

penalty for violations of Chapter 51 is a misdemeanor crime for intentional violations, punishable by up to a $750 fine and/or six months imprisonment. Wyo. Stat. Ann. § 11-51-104(c). Last, Wyoming's Controlled Substances Act was amended to include "naturally occurring" substances and specifically include "delta 8 cis or trans tetrahydrocannabinol and their optical isomers" as a prohibited substance. Wyo. Stat. Ann. § 35-7-1014(d)(xxi). Hemp, which was previously listed as an exception from the controlled substances list, now has a more narrowed exception. Wyoming Statute § 35-7-1063(b)(i) was changed as follows: "'Hemp' or 'hemp product' means all parts, seeds and varieties of the plant cannabis sativa l. or a product made from that plant with **no synthetic substances and with** a ~~trans delta 9 tetrahydrocannabinol (THC)~~ **THC** concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis." (bold indicates new language and strike through indicates removal of prior language).

In sum, the Wyoming Legislature made four major changes to Wyoming's laws regulating hemp. First, it prohibits the use or inclusion of synthetic substances when making a "product, derivative, extract, cannabinoid, isomer, acid, salt or salt isomer" of hemp. Wyo. Stat. Ann. §§ 11-51-101(a)(viii), 11-51-103(f)(ii). Second, THC's definition was expanded to include any psychoactive structural, optical, or geometric isomers of tetrahydrocannabinol; which encompasses delta-8. Wyo. Stat. Ann. §§ 11-51-101(a)(vii); 14-3-301(a)(xi); 35-7-1014(d)(xxi). Third, it prohibits the production, processing, or sale of hemp products with synthetic substances or more than 0.3% of THC under the expanded definition; i.e., delta-8 or other psychoactive isomers. Wyo. Stat. Ann. § 11-51-103(f)(i). Fourth, delta-8 cis or trans tetrahydrocannabinol and their optical isomers are specifically

listed as controlled substances. Wyo. Stat. Ann. § 35-7-1014(d)(xxi). The amendments became effective on July 1, 2024.

Plaintiffs argue the amendments are unconstitutional because they impermissibly narrow the definition of hemp and are preempted by the 2018 Farm Bill. They allege a person can no longer possess, sell, transport, or produce the previously decriminalized hemp-derived cannabinoids in Wyoming under the new statutory scheme—specifically, cannabidiol ("CBD") and delta-8. That effect, they allege, conflicts with the 2018 Farm Bill's legalization of hemp and interstate commerce protections. As producers, transporters, and/or sellers of CBD, an isomer of THC, and delta-8 THC, the statute poses a direct harm to their businesses. While the overall claim appears to be the that the 2018 Farm Bill preempts SEA 24, Plaintiffs also claim that SEA 24 is unconstitutionally overbroad and vague. [ECF No. 1, at 13–15, 20]. The Brief in Support of Motion for Temporary Restraining Order or Alternative Motion for Preliminary Injunction also argues SEA 24 constitutes a regulatory taking. [ECF No. 7, at 3].

## RELEVANT LAW

"The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order." *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018) (citing 13 JAMES WM MOORE, MOORE'S FEDERAL PRACTICE ¶ 65.36 (3d ed. 2014)). TROs chiefly differ from preliminary injunctions in duration and that they may be granted without notice to the opposing party. *Id.*; Fed. R. Civ. P. 65. The initial timeframe for a TRO is limited to fourteen days from the hour it is issued. Fed. R. Civ. P. 65(b)(2). An extension may only be extended an additional

fourteen days for good cause or a longer duration if the opposing party consents. *Id.* When "a temporary restraining order continued beyond the time permissible under Rule 65 must be treated as a preliminary injunction, and must conform to the standards applicable to preliminary injunctions." *Sampson v. Murray*, 415 U.S. 61, 86 (1974). Additionally, "[t]emporary restraining orders are not ordinarily appealable, but preliminary injunctions are appealable." *Tooele Cnty. v. United States*, 820 F.3d 1183, 1186 (10th Cir. 2016).

A TRO's *ex parte* nature and short duration represent it is designed to preserve the status quo between the parties by preventing irreparable injury until a court can rule on the merits of a preliminary injunction. *Flying Cross Check, L.L.C. v. Cent. Hockey League, Inc.*, 153 F. Supp. 2d 1253, 1258 (D. Kan. 2001). "The status quo is defined as the last peaceable uncontested status existing between the parties before the dispute developed." *Miller v. Austin*, 622 F. Supp. 3d 1105, 1108 (D. Wyo. 2022). In contrast, preliminary injunctions "preserve the relative positions of the parties until a trial on the merits can be held." *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). "In both cases, however, injunctive relief is an extraordinary remedy." *People's Tr. Fed. Credit Union*, 350 F. Supp. 3d at 1138 (quotations omitted). This extraordinary remedy is not awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Rather, courts are required to balance the competing claims of the injury while considering the effect of granting or denying the motion upon each party. *Id.* In doing so, courts utilize a four-prong test to determine if a party is entitled to a TRO or preliminary injunction. *Free the Nipple-Fort Collins v. City of Fort Collins, Co.*, 916 F.3d 792, 797 (10th Cir. 2019).

First, the moving party must show a substantial likelihood of success on the merits. *Id.* Second, the movant would suffer irreparable harm if the motion is denied. *Id.* Third, the threatened injury outweighs the opposing party's injury if the injunction is granted. *Id.* Last, that granting the injunction is not contrary to public interest. *Id.* Public consequences of granting the extraordinary relief are particularly important for the court's consideration. *Winter*, 555 U.S. at 376–77. The consideration of these elements rests in a district court's discretion and is only overturned for an abuse of that discretion. *Free the Nipple-Fort Collins*, 916 F.3d at 796. "A district court's decision crosses the abuse-of-discretion line if it rests on an erroneous legal conclusion or lacks a rational basis in the record." *Id.* Factual findings are reviewed for clear error and legal conclusions are reviewed de novo. *Id.* at 796–797.

After the U.S. Supreme Court's decision in *Winter*, there is no longer a "modified burden" for the first prong if the other three elements tip strongly in the movant's favor. 555 U.S. at 22; *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016). Additionally, the Tenth Circuit has recognized "three types of specifically disfavored preliminary injunctions." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004), *aff'd Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006); *Free the Nipple-Fort Collins*, 916 F.3d at 797. Those types are "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Id.* Preliminary injunctions that fall into one of these categories are subject to a heightened

burden. That heightened burden requires "a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *O Centro Espirita Beneficiente Uniao Do Vegetal*, 389 F.3d at 976; *Free the Nipple-Fort Collins*, 916 F.3d at 797.

### RULING OF THE COURT

Because TROs and preliminary injunctions are analyzed under the same structure, the Court will conduct the same analysis for both. At the outset, the Court concludes Plaintiffs' requested relief does not fit into any of the heightened categories of scrutiny. The State Defendants argue it fits into the third category, that an "injunction could afford Plaintiffs all the relief [they] could recover at the conclusion of a full trial." [ECF No. 19, at 4]. However, that is not the case. A preliminary injunction would not indefinitely declare SEA 24 unconstitutional. It would only enjoin the laws enforcement until a final ruling was entered. "[A] preliminary injunction falls into the all-the-relief category only if its effect, 'once complied with, cannot be undone.'" *Free the Nipple-Fort Collins*, 916 F.3d at 798 n.3 (10th Cir. 2019) (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246–50 (10th Cir. 2001)). Any enjoinment is not undoable at this stage and instead would keep the status quo before SEA 24 went into effect on July 1, 2024. Regardless, Plaintiffs do not meet the general standard for a preliminary injunction, making the use of the heightened standard unavailing.

Additionally, Defendants disputed Plaintiffs' standing to bring these claims in their opposition. They assert the Plaintiffs must establish their engagement in interstate commerce to have standing. [ECF No. 19, at 5] (citing *Duke's Inv's LLC v. Char*, No. 22-

00385, 2022 WL 17128976, at 6 (D. Haw. Nov. 22, 2022)). After the July 12, 2024, evidentiary hearing, it no longer appears that is still in dispute. At least some of the Plaintiffs' businesses spoke and connected their activities to interstate commerce. *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) ("If at least one plaintiff has standing, the suit may proceed."). Moreover, the Court is uncertain if Plaintiffs must allege interstate commerce activity in this case. Most of the Plaintiffs sufficiently allege their business activities will be harmed by the enforcement of SEA 24. That act was signed into law and went into effect on July 1, 2024. They therefore have a concrete injury, particularized to their businesses, with actual harm traceable to SEA 24's enforcement by the State of Wyoming. *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007) (enumerating the requirements for standing).

## I. Plaintiffs do not Have a Substantial Likelihood of Success on the Merits

The first prong of a preliminary injunction analysis requires a movant to prove a substantial likelihood of success on the merits of the case. *Free the Nipple-Fort Collins*, 916 F.3d at 797. Plaintiffs offer five theories as to why they have a substantial likelihood of success on the merits:

> SEA 24 is unconstitutional because it (A) is preempted by the 2018 Farm Bill, which solidifies the broad definition of hemp and declares hemp and all derivatives and isomers thereof legal; (B) is preempted by the 2018 Farm Bill by precluding the interstate commerce of hemp; (C) impermissibly restricts the interstate commerce of hemp in violation of the Commerce Clause; (D) its regulatory scheme results in an impermissible regulatory taking, effectively creating a total ban of hemp containing any amount of tetrahydrocannabinol and thus infringing upon Plaintiffs' businesses; and (E) is void for vagueness due to its failure to provide clarity and fair warning to persons of ordinary intelligence as to its requirements.

[ECF No. 7, at 7]. The first two theories rest upon preemption, while the remaining three have their own individual grounds.

### A. No Preemption

Plaintiffs bring their claims pursuant to 42 U.S.C. § 1983. [ECF No. 1, at 4]; [ECF No. 7, at 7]. Under § 1983, a person may bring suit against a state official who, under the color of state law, violates that person's rights guaranteed by the U.S. Constitution or federal law. Key to that analysis is a vindication of a federal right. "[O]ne cannot go into court and claim a violation of § 1983—for § 1983 by itself does not protect anyone against anything." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 904 (10th Cir. 2017) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002)). Section 1983 simply provides a remedy for the enforcement of a federal right. *Gonzaga Univ.*, 536 U.S. at 284. "[I]t does not create any substantive rights; substantive rights must come from the Constitution or federal statute." *Schaefer v. Las Cruces Pub. Sch. Dist.*, 716 F. Supp. 2d 1052, 1062 (D.N.M. 2010).

The first two theories allege the 2018 Farm Bill preempts SEA 24. Thus, Plaintiffs must point to a substantive right created in the 2018 Farm Bill to assert a § 1983 claim or a private right of action within the 2018 Farm Bill. To meet that burden, Plaintiffs compare the definitions of hemp in 7 U.S.C. § 1639o(1). Yet, that argument skips a step in the analysis because it does not point to any federal right conferred in the 2018 Farm Bill.

"'For a statute to create such private rights, its text must be phrased in terms of the persons benefited.'" *Safe Streets All.*, 859 F.3d at 903 (quoting *Gonzaga Univ.*, 536 U.S. at 284). For example, Title VI and Title IX of the 1972 Educational Amendments create

individual rights because there is a focus on a protected class. *Gonzaga Univ.*, 536 U.S. at 284. Title VI protects individuals from discrimination based on race, color, or national origin, while Title IX protects individuals on the basis of sex. Conversely, "[s]tatutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Safe Streets All.*, 859 F.3d at 903 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001)).

A review of the sections cited by Plaintiff show that neither of the provisions confer any rights. Rather, it is even further removed from conferring a right because it does not focus on protected individuals nor regulation of persons, "but [primarily] on the agencies that will do the regulating." *Alexander*, 532 U.S. at 289. Section 1639o simply provides definitions, including a definition for hemp. But the mere fact federal law defines hemp, does not mean it confers a right to hemp under that definition. Federal statutes are replete with definitions. It is farfetched to assume every definition confers a right to a person without some other affirmative congressional expression of intent to confer that right. *See* 21 USCA § 321a (the federal definition of butter).

At the hearing, Plaintiffs implored the Court to see that the intent behind the 2018 Farm Bill was to legalize hemp. However, a court begins a statutory analysis with the plain language of that statute. *Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1265 (10th Cir. 2014). When the plain language of the statute is clear, the inquiry ends there. *Id.* Only if the statute is ambiguous does a court turn to legislative history and the underlying public policy of a statute. *Id.* There is no facial ambiguity in § 1639o. Perhaps the most telling provision on Congress' intent is contained in the test of the statute at 7 U.S.C. § 1639p. Subsection (3)

11

paragraph (A) is entitled "[n]o preemption." Specifically, it states "[n]othing in this subsection preempts or limits any law of a State or Indian tribe that (i) regulates the production of hemp; and (ii) **is more stringent than this subchapter**." § 1639p(a)(3)(A) (emphasis added). That statement indicates Congress' intent for States to retain regulatory authority over hemp. Using "subchapter" refers to Subchapter VII of 7 U.S.C. Chapter 38, entitled "Hemp Production." Subchapter VII includes §§ 1639o, 1639p, 1639q, 1639r, and 1639s. Section 1639o, of course, contains the definition of hemp. Unambiguously then, § 1639p(a)(3)(A) plainly allows a State to enact a more stringent definition of hemp and regulate production of hemp.

Plaintiffs cite to other cases that are readily distinguishable. First, *AK Futures LLC v. Boyd St. Distro, LLC*, was a trademark infringement case. 35 F.4th 682, 687 (9th Cir. 687). Tangentially, the court was tasked with determining whether delta-8 was legal under federal law. *Id.* at 690. After analyzing the 2018 Farm Bill, the court concluded delta-8 was legal at the federal level. *Id.* at 690–92. However, delta-8's federal legality, and the *AK Futures LLC* decision, has no bearing on the facts of this case. There was no consideration of the interplay of the 2018 Farm Bill and state law. That gives the case little persuasive value.

Second, Plaintiffs cite to *Bio Gen., LLC v. Sanders*. 690 F.Supp.3d 927 (E.D. Ark. 2023). After directing the parties to brief whether the 2018 Farm Bill provides a private right of action, the Court found it was not required with little analysis on that point. *Id.* at 935. *Bio Gen., LLC*, while more on point, is an outlier in federal cases dealing with State regulation of hemp. The court was correct in concluding a private right of action was not

12

required; however, a § 1983 action cannot proceed unless a federal right is identified. *Safe Streets All.*, 859 F.3d at 904. Other courts have readily found a plaintiff bringing similar claims to Plaintiffs' are unlikely to succeed. *Duke's Invs. LLC v. Char*, No. CV 22-00385 LEK-RT, 2022 WL 17128976, at *9 (D. Haw. Nov. 22, 2022); *Dines v. Kelly*, No. 22CV02248KHVGEB, 2022 WL 16762903, at *7 (D. Kan. Nov. 8, 2022) ("In short, no part of the 2018 Farm Act demonstrates an unmistakable focus to benefit plaintiff or other unlicensed possessors and sellers of hemp products."); *Hemp Quarters 605 LLC, v. Noem, et al.*, No. 3:24-CV-03016-ECS, 2024 WL 3250461, at *4 (D.S.D. June 29, 2024).

Last, Plaintiffs cite to a Kentucky state court case, *Ky. Hemp Ass'n et al. v. Quarles et al.*, Case No. 21-CI-836 2022 Ky. Cir. LEXIS 7 (Ky. Cir. Ct. Aug. 3, 2022). Again, this case is readily distinguishable. There, the plaintiffs challenged a state agency's enforcement of Kentucky's hemp statutes, arguing delta-8 was excluded. "The central question [was] whether, under the law, delta-8 THC is prohibited or exempted by duly enacted legislation." *Id.* at *17. A state court concluding state enacted legislation exempted delta-8 from the controlled substances list is not persuasive in the circumstances presented to this Court.

Section 10114 of the 2018 Farm Bill (Pub. L. 115-334, Title X, § 10114), while expressly forbidding States from prohibiting transportation of hemp and hemp products through interstate commerce, similarly provides plaintiff no relief. That is an exercise of the United State's interstate commerce power, not a conferment of rights. Recently, the Tenth Circuit found that there is no private right of action in § 10114. "Congress did not intend to create a private right in § 10114(b), which focuses on regulated entities (States

13

and Tribes) and never mentions [Plaintiffs'] purported class of licensed hemp farmers." *Serna v. Denver Police Dep't*, 58 F.4th 1167, 1171 (10th Cir. 2023).

Moreover, even if Plaintiffs could assert a claim for preemption here, it would nevertheless fail. Wyoming Statute § 11-51-103 does not prohibit the possession or transportation of hemp as defined in Wyoming. While there may be a conflict with Wyoming's inclusion of "delta 8 cis or trans tetrahydrocannabinol and their optical isomers" as a schedule 1 substance, there is not enough briefing on that issue to meet Plaintiffs' heavy burden to obtain a preliminary injunction. Even so, the Tenth Circuit's decision in *Serna* would negate such a claim. There, a man attempted to fly from Denver International Airport to Texas with 32 hemp plants or clones with less than 0.3% THC. *Serna*, 58 F.4th at 1169. Even though the plants were grown in compliance with the 2018 Farm Bill, they were confiscated by a Denver Police Department Officer. That alleged inhibition on interstate commerce did not affect the Tenth Circuit's conclusion that the plaintiff could not bring a claim under § 101114(b). *Id.* at 1170–72. Last, § 101114(b) only pertains to the transportation of hemp under the federal definition. It does not require States to allow the cultivation, manufacture, or sale of hemp. Any conflict would only necessitate the transportation of hemp, as federally defined, through Wyoming when involved in interstate commerce. It would not afford Plaintiffs any right to produce or sell hemp, as federally defined, because federal law does not require States to allow for the production of hemp. 7 U.S.C. § 1639p. Further, a requirement for States to allow for the production and sale of hemp could run afoul of the anticommandeering doctrine. *Murphy v. Nat'l*

*Collegiate Athletic Ass'n*, 584 U.S. 453, 470–474 (2018) (discussing the anticommandeering doctrine and its history).

In short, Plaintiffs do not have the requisite right conferred by the U.S. Constitution or federal statute to make a preemption claim. "Where a federal statute 'simply does not create substantive rights,' the Supreme Court has explained that it is 'unnecessary to address [any] remaining issues' about a private citizen's ability to enforce that statute or obtain relief." *Safe Streets All.*, 859 F.3d at 903 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 11 (1981)). This situation can be likened to States that prohibit the sale of alcohol on Sundays or other Sunday closing laws. The U.S. Supreme Court has upheld those laws, implicitly reasoning that States may exercise their general sovereign power so long as it does not conflict with the U.S. Constitution or other federal laws. *McGowan v. State of Md.*, 366 U.S. 420 (1961). While there may be no federal bar to certain substances or actions, that does not mean States are powerless to enact their own prohibitions or create a federal right. It is "a highly dubious proposition that Article III courts have ever provided free-floating injunctive relief under federal statutes for violations of individuals' non-federal rights, whether sitting in law or in equity." *Safe Streets All.*, 859 F.3d at 903. Foundational to the formation of the United States is the principal of federalism. The United States has only the power conferred to it by the U.S. Constitution, while the remaining belongs to the States. Traditional sovereign authority empowers States to enact laws for the social welfare of their citizens.

**B. SEA 24 does not violate the Dormant Commerce Clause**

Plaintiffs also allege SEA 24 violates the dormant Commerce Clause. Unlike a preemption claim, federal courts do not require a substantive federal right for a plaintiff to bring a dormant Commerce Clause claim. Instead, plaintiff only must have standing under Article III. *See Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286 (1997) ("Consumers who suffer this sort of injury from regulation forbidden under the Commerce Clause satisfy the standing requirements of Article III.") The U.S. Supreme Court "has distinguished between state statutes that burden interstate transactions only incidentally, and those that affirmatively discriminate against such transactions." *Maine v. Taylor*, 477 U.S. 131, 138 (1986). "A statute may discriminate against interstate commerce on its face or in practical effect." *Direct Mktg. Ass'n v. Brohl*, 814 F.3d 1129, 1140 (10th Cir. 2016). "Discriminatory laws are those that 'mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1040 (10th Cir. 2009) (quoting *Granholm v. Heald*, 544 U.S. 460, 472 (2005)).

In other words, discriminatory statutes are those that in some way actively attempt to regulate commerce or some instrumentality of it.  It does not appear Plaintiffs allege any discrimination here and the Court does not see a basis for a discrimination claim against SEA 24. Rather, that it has an incidental effect on interstate commerce. They use the example of "[a] truck driver transporting hemp extracts to Montana from a farm in Oklahoma fac[ing] criminal sanction were his truck to be stopped by law enforcement in Wyoming." [ECF No. 7, at 16]. That example falls squarely within the "incidental effect" category. Statutes with an incidental burden on interstate transactions utilize the *Pike*

balancing test. Those statutes "violate the Commerce Clause only if the burdens they impose on interstate trade are 'clearly excessive in relation to the putative local benefits.'" *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). However, "'no clear line separates the *Pike* line of cases from our core antidiscrimination precedents. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 377 (2023) (quoting *General Motors Corp. v. Tracy*, 519 U.S. 278, 298, n. 12 (1997)). "[T]he *Pike* line serves as an important reminder that a law's practical effects may also disclose the presence of a discriminatory purpose." *Id.*

Plaintiffs' dormant Commerce Clause is specious considering there is already federal law in place. "[T]he very premise of the negative Commerce Clause is the absence of congressional action. *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 616 (1997) (Thomas, J., dissenting). Dormant Commerce Clause analyses are conducted in the absence of a federal statute. Controlling cases look only to a state law's effect on commerce generally. This Court will not depart from those cases because doing so would render preemption caselaw, which requires a substantive federal right, meaningless. A plaintiff would only need to bring a dormant Commerce Clause claim to skirt any absence of a federal right. Accordingly, Section 10114 of the 2018 Farm Bill is not a proper consideration for the dormant Commerce Clause analysis.

As explained, *supra*, States have the sovereign power to legislate for the social welfare of their citizens. Wyoming used that power when the legislature passed SEA 24 and Governor Gordon signed it into law. It has no discriminatory basis and is simply Wyoming's decision of what substances are allowed within its borders. This is not the

correlation to interstate commerce the dormant Commerce Clause requires. Courts must exercise "extreme caution" before judicially enforcing the dormant Commerce Clause. *Nat'l Pork Producers Council*, 598 U.S. at 390. Determining the Commerce Clause prohibits States from excluding what they deem harmful substances, on a non-discriminatory basis, would exceed the bounds of all caution. Such a conclusion would inflate the Commerce Clause beyond "commerce" and enable Congress to disguise regulation of traditional State sovereign areas as interstate commerce legislation. Further "the Supreme Court has repeatedly stressed that laws are not to be understood in isolation, but in their broader context." *Direct Mktg. Ass'n*, 814 F.3d at 1143. SEA 24's broader context is Wyoming's regulation of what it deems a potential threat to its citizens, which is only tangentially related to commerce by its transportation through the state.

Last, differing state laws in the absence of a federal ban is not unique. The U.S. Supreme Court's analysis in *Murphy* is analogous to this case. 584 U.S. 453. There, the Supreme Court found 28 U.S.C. § 3702, which prohibited States from authorizing sports gambling, unconstitutional because it violated the anticommandeering doctrine. *Id.* at 480. Ultimately, the Court found "Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own." *Id.* at 486. That decision has led to sport gambling's legalization in some States, and a continued prohibition in others. While the Court's qualification that States may regulate sports gambling "if [Congress] elects not to do so" may seem to support Plaintiffs, a review of the analysis further supports this Court's opinion.

Part of the analysis in *Murphy* touched on preemption and the Commerce Clause. *Id.* at 477–80. It explained any preemption "must represent the exercise of a power conferred on Congress by the Constitution." *Id.* at 477.[2] A second limitation is that Congress may only regulate individuals, not States. *Id.* Applying those requirements, the Court found the only reasonable construction was to read § 3702(1) as a direct command to the States prohibiting any authorization of sport gambling. *Id.* at 480. It did not regulate private actors nor provide any federal rights. *Id.* at 480.

While that analysis deals with preemption, the basis still lies in the Commerce Clause and its scope. Congress could "regulate sports gambling directly" but "lacks the authority to prohibit a State from legalizing sports gambling." *Id.* at 486 (first quotation), 484 (second quotation). That holding implicitly recognizes a divided regulatory scheme. The Commerce Clause empowers Congress to enact a federal regulatory scheme for sports gambling, but it does not allow Congress to control a State's allowance or prohibition sports gambling in the first place. If there was a conflict between a State's regulation of sports gambling and the federal regulation of it, federal legislation would reign supreme. *Id.* at 486 ("Congress can regulate sports gambling directly, but if it elects not to do so,

---

[2] *United States v. Lopez*, 514 U.S. 549, 552 (1995) explains:

> The Constitution creates a Federal Government of enumerated powers. See Art. I, § 8. As James Madison wrote: "The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." The Federalist No. 45, pp. 292–293 (C. Rossiter ed. 1961). This constitutionally mandated division of authority "was adopted by the Framers to ensure protection of our fundamental liberties." *Gregory v. Ashcroft*, 501 U.S. 452, 458, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991) (internal quotation marks omitted). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Ibid.*

each State is free to act on its own."). But, if Congress regulated gambling on college sports, and a State only allowed gambling on professional sports, Congress could not force a State to allow gambling on college sports. *Id.* at 477–84.

Applying that reasoning to the circumstances of this case, the Commerce Clause empowers Congress to allow for, and regulate the hemp production. It is not a basis to require States to allow hemp. This is different than if Congress were to prohibit hemp, but a State allowed hemp. Interplay between federal and state regulations can be thought of as an entryway to a house. Some homes have a single door where entry can happen once it is opened. That represents situations where either the federal or state government has exclusive control. For example, only the federal government can coin money (U.S. Const. art. I, § 8, cl. 5), declare war (U.S. Const. art. I, § 8, cl. 11), and conduct foreign affairs (U.S. Const. art. I, § 8, cl. 3; § 10, cl. 3). States, in turn, retain all powers not enumerated to the federal government under the U.S. Constitution (U.S. Const. amend. X) commonly referred to as police powers. Police powers "are numerous and indefinite." *Lopez*, 514 U.S. at 552. However, some homes have both a screen door and a second door. Each represents a different obstacle to enter the home and is akin to the situation here. Federal powers are contemplated by one door, while the other represents state sovereignty. One door may open, while the other remains closed.

### C. No Impermissible Regulatory Taking

The Fifth Amendment, as applied to the States through the Fourteenth Amendment, prohibits States from taking private property for public use without just compensation. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005). Commonly referred to as the

Takings Clause, it does not prohibit taking of private property, but rather qualifies the exercise of that power. *Id.* Instead, it secures a person's compensation when an otherwise proper interference takes place. *Id.* at 537. A proper interference is when the taking is done for "public use." *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 231 (2003).

Takings may occur in two forms: by physical appropriation, the classic example; or by regulation, when regulation restricts property rights so much it amounts to a taking. *Lingle*, 544 U.S. at 536. Plaintiffs argue SEA 24 constitutes a regulatory taking because it effectively bans hemp as federally defined. There are "two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes." *Id.* at 538. Those are 1) when an owner suffers from a permanent physical invasion on their property, and 2) when the regulation deprives a person from all economically beneficial use of his property. *Id.*

Plaintiffs do not argue, and this Court does not find, this is a *per se* regulatory taking claim. First, there is no physical intrusion. Second, Plaintiffs are not completely deprived of all economic benefits. SEA 24, as it relates to the takings claim, has two primary effects; delta-8 cannot exceed 0.3% and the use of synthetic substances is banned when processing hemp. Hemp, as grown, can still be processed in accordance with SEA 24 or it can be shipped to another State for processing under that State's laws. Farmers can still grow hemp. Manufacturers can produce other products from hemp. Businesses can continue to sell legal forms of hemp. While some prior practices may now be prohibited, that is not a deprivation of all economic benefit.

21

Moreover, the Court is doubtful the Takings Clause even applies to the present circumstances. While it is unfortunate SEA 24 is having a negative impact on Plaintiffs' businesses, their claim does not seemingly fit within regulatory taking jurisprudence. Primarily, SEA 24 does not regulate property. It does not take property for public use. *Hemp Quarters 605 LLC*, 2024 WL 3250461, at *6–7. Nor is it a taking for private use, which the Fifth Amendment prohibits in any circumstance. *Kelo v. City of New London, Conn.*, 545 U.S. 469, 477 (2005). Other takings cases, while ununified and analyzed ad hoc, "aim[] to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539. SEA 24 is not a zoning ordinance prohibiting use of property, nor does it allow public encroachment to private property. A plain reading of SEA 24 shows it does not attempt to regulate property, but instead is a prohibition on substances the state government passed by valid legislation. Those "cases must be governed by principles that do not involve the power of eminent domain." *Mugler v. Kansas*, 123 U.S. 623, 668 (1887).

The U.S. Supreme Court has repeatedly affirmed *Mugler*'s statement that "prohibition[s] simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit." *Id.* at 668–69; *e.g.*, *Goldblatt v. Town of Hempstead, N.Y.*, 369 U.S. 590, 592 (1962) (upholding an ordinance that banned dredging and pit excavating within city limits and stating "If this ordinance is otherwise a valid exercise of the town's police powers, the fact

that it deprives the property of its most beneficial use does not render it unconstitutional."); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 490, (1987) (rejecting the assertion *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413 (1922) overruled *Mugler*); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1023 (1992) ("where [a] State reasonably concludes that the health, safety, morals, or general welfare would be promoted by prohibiting particular contemplated uses of land, compensation need not accompany prohibition" (cleaned up)); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 329, 122 S. Ct. 1465, 1482, 152 L. Ed. 2d 517 (2002) ("we recognized that "'the county might avoid the conclusion that a compensable taking had occurred by establishing that the denial of all use was insulated as a part of the State's authority to enact safety regulations.'" (quoting *First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty., Cal*., 482 U.S. 304, 313 (1987)).

The U.S. Supreme Court was tasked with a similar restriction in *Andrus v. Allard*, 444 U.S. 51 (1979). There, the U.S. Secretary of the Interior promulgated rules pursuant to his power delegated by the Eagle Protection Act and Migratory Bird Treaty Act. Those rules banned lawfully acquired "migratory birds, their parts, nests or eggs from being imported, exported, purchased, sold, bartered, or offered for purchase, sale, trade, or barter," but not their transportation or possession. *Id.* at 54. Similar restrictions were imposed on bald eagles, their parts, nests, or eggs. *Id.* The appellants challenging the law were engaged in trading Indian artifacts where a number of those artifacts were composed of feathers from protected birds. *Id.* Appellants there alleged a taking because they could no longer profit from their artifacts in commercial transactions. The Court rejected that

argument, finding there was no actual taking. Speaking to the distinction, the Court stated "loss of future profits—unaccompanied by any physical property restriction—provides a slender reed [sic] upon which to rest a takings claim." *Id.* at 66. It further provided examples where similar action was upheld:

> Regulations that bar trade in certain goods have been upheld against claims of unconstitutional taking. For example, the Court has sustained regulations prohibiting the sale of alcoholic beverages despite the fact that individuals were left with previously acquired stocks. *Everard's Breweries v. Day*, 265 U.S. 545, 44 S.Ct. 628, 68 L.Ed. 1174 (1924), involved a federal statute that forbade the sale of liquors manufactured before passage of the statute. The claim of a taking in violation of the Fifth Amendment was tersely rejected. *Id.*, at 563, 44 S.Ct., at 633. Similarly, in *Jacob Ruppert, Inc. v. Caffey*, 251 U.S. 264, 40 S.Ct. 141, 64 L.Ed. 260 (1920), a federal law that extended a domestic sales ban from intoxicating to nonintoxicating alcoholic beverages "on hand at the time of the passage of the act," *id.*, at 302, 40 S.Ct., at 150, was upheld. Mr. Justice Brandeis dismissed the takings challenge, stating that "there was no appropriation of private property, but merely a lessening of value due to a permissible restriction imposed upon its use."24 *Id.*, at 303, 40 S.Ct., at 151. *See Mugler v. Kansas*, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887).

*Id.* at 67. However, it was "crucial that appellees retain the rights to possess and transport their property, and to donate or devise the protected birds." *Id.* at 66.

While delta-8 is now a controlled substance and effectively banned, *Andrus* is still convincing. Delta-8, itself, is not something Plaintiffs are in possession of. Rather, it is a product derived from hemp. As to the products that Plaintiffs sold containing delta-8, SEA 24 was signed into law on March 7, 2024, with an effective date of July 1, 2024. There were 116 days for Plaintiffs to sell that product and plenty notice that any new product would become illegal on July 1, 2024. As to the other property, while SEA 24 might "prevent the most profitable use of [it,] … that is not dispositive." *Id.* Plaintiffs can continue

operating their businesses, use their property, and sell hemp products, just not with more than 0.3% delta-8 or synthetic substances.

SEA 24 falls squarely within Wyoming's power to enact safety regulations. Its prohibitions do not regulate private property, but ban substances Wyoming has deemed harmful to its citizens through the legislative process. That critical distinction keeps SEA 24 within a State's broad police powers and away from a Fifth Amendment taking. The economic impact on Plaintiffs, while regrettable, does not present a valid takings claim. *Goldblatt*, 369 U.S. 590, 591, 594–95 (upholding a city ordinance that "in effect prevent[ed] appellants] from continuing their business"). State exercise of police power is judged by its rationality. *Id.* at 594. "[T]he rationality of a State's exercise of its police power demands only that the State 'could rationally have decided' that the measure adopted might achieve the State's objective." *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 843 (1987) (quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981)) (Brennan, J. dissenting).

Wyoming's position was that delta-8 and synthetic substances were already illegal under the prior laws. [ECF No. 19, at 20]. It also was attempting to redress public concerns of delta-8 and other psychoactive substantives. *Id.* at 21. Those concerns included "teens ending up in emergency rooms after consumption of Delta-8" and an FDA release that "sought to inform the public about serious health risks associated with the consumption of" delta-8. *Id.* By including delta-8 as a controlled substance and banning synthetic substances, there is a rational relationship to Wyoming's goal to promote the health and safety of its citizens.

Even if this were an unconstitutional taking for public use, that is not a legitimate ground for a preliminary injunction. "Once a court determines that a taking has occurred, the government retains the whole range of options already available—amendment of the regulation, withdrawal of the invalidated regulation, or exercise of eminent domain." *First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty., Cal.*, 482 U.S. 304, 321 (1987). Wyoming could choose to change SEA 24 or pay just compensation. There is no requirement it be invalidated in these circumstances. Plaintiffs must unfortunately bear the burden of SEA 24. "But, within limits, that is a burden borne to secure 'the advantage of living and doing business in a civilized community.'" *Andrus*, 444 U.S. at 67 (quoting *Pennsylvania Coal Co.*, 260 U.S. at 422).

### D. SEA 24 is not Void for Vagueness

There are two independent reasons a statute is void for vagueness. *Hill v. Colorado*, 530 U.S. 703, 732 (2000). "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* Vagueness challenges can take two forms: facial or as-applied. It is unclear what form Plaintiffs allege. However, given Plaintiffs do not challenge any specific enforcement of SEA 24 to themselves, an as-applied analysis does not necessarily fit. As-applied analyses look to the specific facts of the case and the statutes alleged vague application "to particular parties in particular circumstances." *Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1234 (10th Cir. 2023). On the other hand, facial challenges present a high bar. *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1179 (10th Cir. 2009). Facial challenges are appropriate when "(1) when a

26

statute threatens to chill constitutionally protected conduct (particularly conduct protected by the First Amendment); or (2) when a plaintiff seeks pre-enforcement review of a statute because it is incapable of valid application." *Id.* at 1179–80. The second category appears more appropriate in this case. However, the Court will proceed under an "as-applied" analysis because Plaintiffs have altered their business operations since SEA 24 became effective.[3]

Plaintiffs argue that a person of ordinary intelligence cannot understand what conduct SEA 24 is prohibited regarding "the production, possession, transportation, and shipment of the products [SEA 24] seeks to ban." [ECF No. 7, at 19]. They offer two examples. First, that "farmers awaiting harvest and those intending the plant seeds have no idea how to grow a plant which is required to meet a total delta-9 THC concentration level that is a specific fraction of the CBD concentrations." *Id.* Second, that "the expansion in the definition of THC bans hemp containing any 'psychoactive substance,' a term which is undefined and overly broad so as to potentially ban any hemp-derived cannabinoid product, including CBD isolate with no THC." *Id.* However, the Court's review of SEA 24 does not reveal any unconstitutional vagueness. "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). Regulations of constitutional

---

[3] The "as-applied" analysis also presents a lower standard. Thus, if Plaintiffs cannot succeed under an as-applied analysis, they could not succeed on a facial challenge.

protected rights demand a more stringent test. *Id.* at 499. But laws regulating the economy or businesses undergo a "less strict" test. *Id.* at 498.

SEA 24 is sufficiently clear in what it does. As this Court mentioned at the beginning, SEA 24 made four major changes to Wyoming's laws regulating hemp. First, it prohibits the use or inclusion of synthetic substances when making a "product, derivative, extract, cannabinoid, isomer, acid, salt or salt isomer" of hemp. Wyo. Stat. Ann. §§ 11-51-101(a)(viii), 11-51-103(f)(ii). Second, THC's definition was expanded to include any psychoactive structural, optical, or geometric isomers of tetrahydrocannabinol; which encompasses delta-8. Wyo. Stat. Ann. §§ 11-51-101(a)(vii); 14-3-301(a)(xi); 35-7-1014(d)(xxi). Third, it prohibits the production, processing, or sale of hemp products with synthetic substances or more than .3% of THC under the expanded definition; i.e., delta-8 or other psychoactive isomers. Wyo. Stat. Ann. § 11-51-103(f)(i). Fourth, delta-8 cis or trans tetrahydrocannabinol and their optical isomers are specifically listed as a controlled substance. Wyo. Stat. Ann. § 35-7-1014(d)(xxi).

To simplify it even more, SEA 24 bans synthetic substances in hemp, psychoactive derivatives, and delta-8. Using Plaintiffs' first example, the 0.3% THC threshold was unchanged and is the same threshold in the 2018 Farm Bill. However, from Plaintiffs' arguments at the hearing, it appears the example is poorly phrased. The gravamen of their argument at the hearing was that it appears CBD is now banned. That is not the case and Defendants affirmatively agreed CBD is not banned. The premise of that argument turns on the addition of "synthetic substances" to hemp's definition.

As defined, hemp:

means all parts, seeds and varieties of the plant cannabis sativa l., whether
growing or not, or a product, derivative, extract, cannabinoid, isomer, acid,
salt or salt of isomer made from that plant with no synthetic substance and
with a THC concentration of not more than three-tenths of one percent
(0.3%) on a dry weight basis when using post-decarboxylation or another
similarly reliable testing method.

Wyo. Stat. Ann. § 11-51-101(a)(iii). Synthetic substances are "any synthetic THC,

synthetic cannabinoid or any other drug or psychoactive substance." Wyo. Stat. Ann. § 11-

51-101(a)(viii). Together, that means producers cannot add synthetic THC, synthetic

cannabinoids, other drugs, or other psychoactive substances to hemp products. Synthetic

means artificial. Synthetic synonyms, MERRIAM-WEBSTER, https://www.merriam-

webster.com/thesaurus/synthetic; *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)

(when interpreting statutes courts look to the "plain and unambiguous meaning with regard

to the particular dispute of the case."). What the addition of "synthetic substances" does is

prohibit the addition of artificial psychoactive substances to hemp products. Assuming

there is ambiguity, SEA 24's purpose and the legislative intent was to exclude those

artificial substances from otherwise legal hemp products. *Robinson*, 519 U.S. at 340

(explaining courts can turn to the primary purpose of a statute if there is ambiguity); [ECF

No. 19, at 19–22] (explaining the legislative considerations behind SEA 24].

At the hearing, Plaintiffs argued that CBD is a synthetic substance and is now

banned because most of the CBD from hemp is not naturally occurring. Generally, it is

made by decarboxylating CBDa to CBD. However, a full reading of the statute shows that

is not the case. Immediately following "synthetic substances" in hemp's definition is "and

with a THC concentration of not more than three-tenths of one percent (0.3%) on a dry

weight basis **when using post-decarboxylation or another similarly reliable testing method**." Wyo. Stat. Ann. § 11-51-101(a)(iii) (emphasis added). Using "post-decarboxylation" within the statute shows that decarboxylation is not a prohibited method and a person may produce CBD from hemp via decarboxylation.

Synthetic substance's definition is also much narrower than Plaintiffs suggest. Using "or other psychoactive substance" at the end of its definition creates a limiting clause. Courts apply the rule of the last antecedent when statutes include a list of terms or phrases followed by a limiting clause. *Lockhart v. United States*, 577 U.S. 347, 351 (2016). Generally, that means the clause only modifies the noun or phrase immediately preceding it. At a minimum, "drugs" means psychoactive drugs. However, other indicia of meaning can overcome the rule of last antecedent. *Id.* at 352. Those indicia are found in the context of the statute. *Id.* Section 101's context shows "psychoactive" modifies all terms in the definition. Immediately preceding paragraph (viii), is THC's definition. Each subparagraph of THC's definition includes the word psychoactive. The clear intent of § 11-51-101, from the words in the statute, is to ensure hemp products do not contain psychoactive substances. That overrides the last antecedent rule's presumption.

Psychoactive is also not an unconstitutionally vague term. As Defendants state in their brief, psychoactive is a term recognized in the hemp industry. [ECF No. 19, at 14]. While not specifically defined in the statute, "[t]he DEA defines a 'psychoactive substance' as a mind-altering drug." *Id.* "Mind-altering" assuredly is a broad term, but that does not make it vague. Undoubtedly, Wyoming does not classify CBD as a psychoactive

substance.[4] *Id.* at 13. The degree of the psychoactive effect could cause uncertainty, but there is some guidance in Wyo. Stat. Ann. § 14-3-301(a)(xi), which is cited to in § 11-51-101(a)(vii)(B). There, an analog is defined in part as a substance "[t]hat has a stimulant, depressant or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant or hallucinogenic effect on the central nervous system of a controlled substance listed under W.S. 35-7-1014(d)(xiii) or (xxi)." With that definition included in THC's definition, though not directly mandated, there is a guidepost for the standard of what Wyoming considers psychoactive.

While SEA 24 is not perfect, it is not unconstitutionally vague. SEA 24 sufficiently defines the conduct it prohibits. A person cannot add psychoactive substances to hemp products, nor can he or she make products containing more than 0.3% delta-8[5] or THC. Wyo. Stat. Ann. § 11-51-101(a)(iii), (vii), (viii). Any uncertainties in the statute do not rise to the level of vagueness required to find it unconstitutional.

## II. Irreparable Injury, Balancing of Harms, and Public Interest

Irreparable harm is a high standard. A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain. *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). The "injury must be

---

[4] However, even if CBD was a psychoactive substance, as Plaintiffs argued at the hearing, that would not make SEA 24 unconstitutionally vague. It would only become an additional prohibited substance.

[5] Delta-8's limitation comes from paragraph (vii) subparagraph (B) which includes "analogs of tetrahydrocannabinol as defined by W.S. 14-3-301(a)(xi)." Analogs there are defined as a substance "[w]hose chemical structure is substantially similar to the chemical structure of a controlled substance listed under W.S. 35-7-1014(d)(xiii) or (xxi)." Paragraph (xxi) of § 35-7-101(d) specifically lists "delta 8 cis or trans tetrahydrocannabinol and their optical isomers."

certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "It is also well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages." *Id.*

Plaintiffs point to their monetary damages through their businesses if the Court does not issue a preliminary injunction.  They also argue their inability to use certain hemp products that are now prohibited, such as delta-8, poses a harm. Neither of those are irreparable. Addressing the second argument first, the inability to use certain substances is not unique. Wyoming's Controlled Substances Act bans many other substances. Other drugs require a prescription. The relevant hemp products were not "legalized" until 2018. Going back in time, Plaintiffs and other persons went through life without using the now banned hemp products.

Turning to Plaintiffs' alleged financial injury, that is also insufficient to enjoin enforcement of SEA 24. First, financial injuries are difficult to ascertain in foresight. Plaintiffs testified about how much their profits have decreased since SEA 24 became effective, but there has been almost no time to gauge a reliable change in revenue. Their current situation does not equate to irreparable harm. Should the worst happen, and their businesses fail, a financial judgment can repair that harm. Moreover, Plaintiffs are not entirely innocent. SEA 24 was signed into law in March 2024. The time between then and the effective date gave them sufficient time to prepare for operations under the new hemp laws. They could have ordered different products to sell and filed suit at a much earlier

date. While the laws prohibitions would not have changed, there was time to prepare for its effects.

There is not a potential loss of a constitutional right, imminent physical harm, nor other category of harm that fits within "irreparable." Irreparable harms require more than economic loss and the use of a drug of choice. "If damages can compensate a plaintiff an injunction will not lie." *Holly Sugar Corp. v. Goshen Cnty Coop. Beet Growers Ass'n.*, 725 F.2d 564, 570 (10th Cir. 1984). A full and favorable adjudication on the merits would enable Plaintiffs to recover their financial damages. An inability to use those hemp products does not prevent them from a life-saving drug, such as a diabetics need for insulin.

The Court appreciates the hardships SEA 24 places on Plaintiffs. It is unfortunate their businesses face financial strain and they cannot use the substances that help them. But those burdens are part of living in society. Government regulation, while not always perfect, considers the lives of all citizens. Laws are enacted to promote the general welfare of society and "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., chambers). Wyoming's sovereign ability to govern all of its citizens outweighs Plaintiffs' unique burdens.

Granting an injunction would also run contrary to the public interest. Wyoming's Legislature implicitly recognized the public's interest when passing SEA 24. [ECF No. 19, at 20–21]. They considered the effect some substance was having on its citizens. While their consideration is not entirely dispositive, absent the violation of some right, the Court

should not insert its judgment for that of Wyoming's elected representatives. The public has in interest in knowing the laws passed by their elected officials will not be overturned by the circumstances of a few.

CONCLUSION

Plaintiffs allegations do not reach the standard a preliminary injunction requires. The 2018 Farm Bill does not provide them a substantive right to make a preemption claim, and even if it did, it permits States to impose more stringent restrictions. Their dormant Commerce Clause claim fails because SEA 24 places an insignificant burden on interstate commerce. SEA 24 also does not constitute a taking because it does not attempt to regulate property, but instead is a prohibition on substances the government passed by valid legislation. Its terms, while not perfect, also do not amount to unconstitutional vagueness and give sufficient notice of the prohibited conduct. While the newly prohibited conduct does place a burden on Plaintiffs, it is not irreparable by a full adjudication on the merits, nor does it outweigh Wyoming's interest in enforcing its laws. Public interest is best served by denying Plaintiffs' Motion for Preliminary Injunction.

NOW, THEREFORE, IT IS ORDERED Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction is DENIED.

Dated this 19th day of July, 2024.

Kelly H. Rankin
United States District Judge